May it please the court. For the record, I'm Ray Gunn representing TitleMax of Texas, IB Funding Company and NCP Finance Limited Partnership, the appellants in this case. On January the 27th of last year, the Dallas City Council enacted an ordinance making significant changes to the provisions of the Dallas City Code that regulates so-called payday lending. Compliance with the restrictions imposed by that new ordinance has eviscerated the business of the appellants in Dallas to the point where the district court correctly found that TitleMax and the appellants were suffering irreparable harm and would continue to do so after judicial relief. The court nevertheless denied a preliminary injunction because of its conclusion that the appellants have failed to carry their burden of showing a likely success on the merits. The consequence is that the amending ordinance is destroying the appellant's business in Dallas before its constitutional and statutory validity has been established by any court. As things stand, the city is winning by default and the appellants are losing before they ever get their day in court. Thus, the primary question before this court is whether on an undisputed factual record the appellants demonstrated they are likely to succeed. That is a question for de novo review and I will argue the answer is yes. Unless the court prefers otherwise, I'll devote the bulk of my time to the district court's error in evaluating that likelihood of success beginning with the burden of proof imposed by the district court. I do want to advise both parties that we found a case at the Supreme Court of Texas issued on June 24th of this year. It's Texas Department of State Health Services versus Crown Distributing and it deals with when you have an interest that is protected by the due course of law provision of the Texas Constitution. Neither of you have cited it and so we're not going to talk about it today unless somebody wants to, but I want to give both sides an opportunity to file post-submission letter briefs I guess by noon on Monday. We will do that, Your Honor. I would note that in the case that we'd cite many times, the Patel versus Department of Licensing and Regulation case, Judge Willett, then as Justice Willett in his capacity in concurring that case, said that occupational freedom, the right to earn a living as one chooses, is a non-trivial constitutional right entitled to non-trivial . . . Well, the Supreme Court of Texas has written extensively on that in June and I want to give both sides a chance to . . . We will do that, Your Honor. . . to address that case. Certainly. The court below imposed a heightened burden of proof because the appellants were supposedly asking for a mandatory injunction. We were not. What we asked was that the city be prohibited from enforcing the new restrictions pending trial and the more rigorous standard that is quite properly imposed upon a party seeking a mandatory injunction did not apply here. The district judge, adopting the recommendation of the magistrate judge, went one step further and said without any kind of support that plaintiffs also cannot prevail under the burden of proof they urge this court to apply. There again, the district court erred. The party moving for a preliminary injunction need only make a prima facie showing of likely success on the merits. We more than accomplished that, especially given the sliding scale that applies under this court and other circuits' jurisprudence when the magnitude of the injury is great and the balance of hardship strongly favors the movement. So, speaking briefly to those two elements, first of all, the uncontroverted evidence is that the appellant's injury is devastating. Title Max has slashed staff. It has closed stores. It is suffering mounting losses trying to comply with the amending ordinance and I'm not just talking about lost profits. I'm talking about actual operating losses which the city will never compensate Title Max for in damages as a sovereign immune entity and the undisputed testimony is that Title Max is going to have to shut down its Dallas operations entirely if the amending ordinance is allowed to stand. That situation has only gotten worse. When the record closed, Title Max had closed one store in Dallas. Since then, Title Max has been forced to close four more stores making a total of five out of 17 stores that formerly operated within the city limits of Dallas with more expected to come, again leading to an anticipated total shutdown. An ordinance that destroys a business before any court has upheld its validity is the type of situation for which preliminary injunctive relief is designed and as for the relative balance of hardship, there's nothing to balance because the city put forth no evidence of hardship to the city if an injunction is granted and in particular there was no evidence of any hardship even to consumers because there was no evidence below, no testimony before the city council, no declaration testimony in court from anyone who had ever taken out a so-called payday loan. And the reality, and in fact no one on the council even mentioned having talked to a consumer, the reality is that if an injunction is granted it'll simply mean that the city will have to return to the regime that regulated the appellants and their competitors for a full decade before January the 27th of last year. So with the magnitude of the injury and the balance of hardships weighing conclusively in the favor of the appellants, our burden was reduced to showing some likelihood of success and instead the district court required us to show a clear entitlement to relief. That's at page 715 of the record. It seems beyond question that the mindset reflected in that statement infused everything about the district judge's evaluation of our of the likelihood of success. So briefly to address how we got there under the proper burden. The Texas Supreme Court in that Patel versus Department of Licensing and Regulation case held that the protections afforded by the state guarantee of due course of law are somewhat greater than its federal counterpart under the 14th amendment. We therefore focus below and I'll focus in this argument on that state constitutional protection which again Judge in his capacity as justice will it call rational basis with bite demanding actual rationality evaluating a law's actual basis and apply. Let me tell you what I'm stuck on. The Texas Constitution I think is article one section 19. Well I'm talking about article 16 section 11. So not the due course of law provision. Article 16 section 11 expressly empowers the legislature to regulate interest rates. So there's kind of this long-standing tradition legal recognition dating back to the founding of regulating interest rates that are deemed usurious and the Texas Constitution expressly gives the legislature authority to regulate interest rates and I don't know how that recognition that dates back to the drafting of the Constitution doesn't capsize your case. Certainly your honor. First of all the charges that are levied by Title Max for arranging the loans are not interest. There is a separate interest rate it's less than 10 percent as required by law. So what section 393 of the Texas finance code allows is for people to arrange loans in the capacity as a credit access business or a credit services organization and the fee that's charged is for that. The interest rate is charged by NCP or IV for actually funding the loan. But further I guess I would assume that perhaps the Texas legislature could if it chose to do so outlaw short-term lending by people such as Title Max. It could impose restrictions that made it impossible to do business. That is not the prerogative of a city. The Texas legislature has gone to a certain extent of regulating a fairly extensive extent in regulating this industry. The record below established that the city has gone to the legislature every two years seeking more regulation and has not gotten it. So you're just wait a minute I want to make sure I heard that correctly. You're saying the Texas legislature could constitutionally outlaw short-term lending. I don't know if it could or could not your honor. What I do know is that that the regulation of that is the prerogative of the it does not violate the due course of law provision. That you have a point there your honor. So we're down to the question your honor. We're down to preemption. I don't think that's correct your honor. Again I don't know that that's the case. I do know that the city council does not have the authority to do this. I may have misspoken with respect to whether the legislature could have done so. I do know this is not the and the city does not have the ability to do that. You've asked a very good question. I'm not sure I've given the right answer to it. Back to due course of law what you're being told under the the Patel case what the Texas Supreme Court said was that there's a further step in which the Texas provision is to be in that case the ordinance. Well which I was actually going to raise the question before my colleague Judge Willett did. What if inflation gets to the point where the interest rates being charged are not sufficient to allow any business who lends to stay in business. It's usurious under existing Texas law. Would that violate once it became a real world actual effect would the Texas usury statutes on the books violate the due course of law provision? I'm not sure that I know the answer to that question your honor. I do fall back on the fact that in section 393 the Texas legislature empowered credit access businesses to charge such rates as are agreed to with its customers. And again what happens with the separate interest rate question I don't know. If the simple economic pressures such as we heard we felt in the late 1970s and early 1980s would kick money market accounts up to 20 percent whether that would make it impossible to do business. I don't know the answer to that question. You're being told today your honor that the governmental purpose here was to protect low income borrowers and of course they threw in a couple of references to predatory and abusive. That formulation is suspect because it does not match with what the city council was told was the purpose and what the city council accepted as the two purposes of the ordinance when it was adopted. The ordinance made two major changes and I'll address the first one which is the mandatory payback requirement for all loans which required that the loans be repaid in not less than not more than four payments of not less than 25 percent of the total consideration each time. The undisputed evidence is that in practice that or that requirement is scaring away people from taking out title secured loans which makes sense when someone of our customer base comes in needing 1500 dollars in emergency cash that person is not going to have the confidence that he or she can pay back 25 percent of that total 30 days after taking out the loan. And that means that the new requirement takes away the most likely source of credit for a customer because Comerica and Bank America aren't going to loan 1500 dollars secured by the title to a seven-year-old F-150 pickup. The amending ordinance does not protect the potential borrower in the words of the newly constructed purpose here. What it does is force on the borrower a repayment requirement that is likely unrealistic for him but that some well-intentioned proponents and city council members think is best. And by the way it does appear that the council didn't even know that it was making that change which was not even mentioned in any of the three meetings before the council or its committee or the presentation by the proponents. I'll move on because of the shortness of time here. None of those hopefully unintentional effects of the ordinance should surprise because this court in St. Joseph Abbey versus Castile said that deference to economic regulation does not demand judicial blindness to the history of a challenge rule or the context of its adoption. And again as to quote Judge Willett and Patel, judges weighing constitutional challenges should scrutinize government's actual justifications for a law, what policymakers really had in mind not something they dreamed up after litigation erupted. The city council's two stated purposes were flawed. They've been abandoned. This council made no effort to amend the ordinance and it is our belief, your honors, does contravene Texas due course of law. As my time comes to an end, obviously we're asking that the denial of the preliminary injunction be reversed. The next question would be what comes next. And the appropriate disposition would be for this court to direct the district court to enter the requested injunction. There's no need for further proceedings below. There's no need for further briefing or hearing. We've covered those two of those four requisites, the irreparable harm and the like. Where is the state of the litigation now? I mean it's been around for a while. Where are we? It has been around for a while, your honor, which is which is one of my points. We filed this case in in spring of last year. Our motion for preliminary injunction is now 13 months old. With the pendency of that motion in place, basically we are continuing to lose money. Again, stores are closing. There's a real urgency here because the monetary loss has been set for trial. We're in deposition discovery now, your honor. That's the problem. The last factor that I'll address in the last minute of this presentation is the the factor that the district court did not consider, which is the public interest. The city's argument here is condescending as it can be. The enactment of the amended ordinance by the city's leaders is the best guidepost to show what's in the public interest. That's at page 39 of their brief. Respectfully, city officials don't always know what's in the public interest or always act in it. Well-intentioned city council members sometimes make mistakes that cause harm, such as here where they solicit and hear only one side of a story, where they make assumptions without questioning them, where they undertake no investigation or analysis, where they enact verbatim an ordinance from another city without examining its contents. And again, your honor, there's urgency here because with discovery still underway, we aren't even set for trial 13 months after we move for the preliminary injunction. The relief we seek should issue straight away. When the district court imposed that burden of a clear entitlement, it was doing something that Judge Willett, again, called loading the dice in the government's favor and recasting the test as pass-fail. That decision should not stand. Thank you. I please the court. My name is Gary Powell. I'm a senior assistant city attorney for the city of Dallas, and I'm pleased and proud to be here representing the city of Dallas and the citizens of the city of Dallas in this very important case to the city. I'm going to address principally the Patel issue that they've raised, and time permitting, we'll also address what I kind of think of as the Murphy and McDonald issue, which is kind of a subsidiary basis they raised for the appeal. And in the course of addressing those, there's various other points and considerations that I'll address. Fundamentally, your honor, this amended ordinance is a valid, proper, and reasonable, rational exercise of the city's police power as a home rule city under Texas law to try and protect the general economic welfare of the city's low-income residents and to try and shield them from some of the predatory, abusive loan terms that small, low-income consumers face from organizations, brokers. Title Max makes the point of saying they're not a lender, but they are in this business. They are a broker. Therefore, the charges that they extract from their low-income borrowers are not capped or controlled by the usury statutes. They're outside of that. In our briefing, we laid out from their own disclosures that the charges they make, again, they're not interest. The interest is limited to 10%. The charges they make, for example, on the unsecured personal loan product that they marketed, are 50 to 60 times the 10% interest rate. The APR on these is north of 550, and in some cases, even 600%. From their own disclosures, that information is clear and available. Your honor, I want to just talk briefly about putting in context what we're dealing with here and putting this product, giving some factual context to it. We've addressed in our brief, one of the disclosures Title Max made, for example, is its title, secured title product. One example of that is a $1,250 loan. That $1,250 loan, Title Max markets a product, at least used to market a product before the ordinance, that they called their 4-5 product. Under that product, $1,250 loan, secured by someone's car title, the loan structure required them to make $215 a month payments over four months. After four months, they paid $860. There is a balloon payment coming due in the fifth month of $1,550, which is $300 more than they initially borrowed, coming due in the fifth month. The $860 that they paid in those previous four months doesn't reduce the amount owed at all. They owe $300 more than they initially borrowed, so that the total payment for that product is right at $2,400 on a $1,250 loan. That's the product that Title Max was marketing before the ordinance. What the ordinance called for was, in order to try and address a cycle of debt problem, where people were getting to the end of these loan products and they would have a large balloon, like in this case, $1,550 balloon payment coming due, that they couldn't do and they would need to refinance and they'd get caught up in the cycle of debt. The other problem that the restructure was designed to do was to try and help people, well, avoid the cycle of debt and space out these payments. And so the ordinance essentially, if you take the same total payout at the end of this loan that I've been talking about of roughly $2,400, the $860 and the $1,550, under the ordinance it would have been restructured where someone would be making four equal payments of $600 each. Admittedly, $600 is more than $215, so their early payments are going to be a bit more, but by the end of that four payment period, they're going to have their loan paid off, their title is protected, they get their title back, they're not going to get repossessed, they're not facing a large balloon payment. Mr. Powell, let me interrupt you. Yes, Your Honor. This is a Texas-wide issue. Why does Dallas come in here and step in and make its own rule that's different from the statewide rule? Well, Your Honor, in the findings, conclusions, recommendations that the magistrate wrote addresses in some detail the preemption argument and the point you're making, they argued at the court below and the magistrate addressed it and dealt with it and disposed of it and held that the state law did not preempt the ordinance. Texas law structure is such that a home rule city like the city of Dallas is authorized by the Constitution. As long as they don't make statutes that directly conflict with state law. Well, why doesn't this directly conflict? Well, again, the magistrate concluded it did not and they haven't brought that issue forward. They're arguing Patel, I guess maybe in a broader context, let me make this point in answer to your question, Your Honor. At the time of the injunction proceedings below, they've raised four or five issues. One was Patel, which is based on state constitution due course of law. The other one was a federal due process claim, which was the basis for federal jurisdiction. They raised a preemption argument that chapter 393 of the Texas Finance Code totally preempted. Dallas couldn't do anything different. They raised that preemption argument below and then they raised an argument based on a couple of Fort Worth Court of Appeals opinions. It was another species of a preemption argument. The magistrate found against them on all of those, found they had not shown a substantial likelihood of success. When they made their objections under 28 U.S.C. 636 that they're obligated to do, they had to make their objections to the district court and the statute and the recommendation from the magistrate made clear you have to make your objections within the allowed time and if you don't object, then you're going to be barred from pursuing those on appeal. They brought forward to Patel, which they brought forward in this appeal, and they made objections to the district court based to the district judge based on these two Fort Worth Court of Appeals cases, saying that those cases essentially should invalidate the Dallas ordinance. They did not bring forward specifically any argument based on chapter 393 of the Finance Code, which is the Office of Consumer Credit Commissioner, OCCC, which we call it, which is the state agency that kind of has some say. It's not any kind of heavy regulatory as they might try and characterize it, but it has kind of supervisory authority over this. The law, going back for decades in Texas, is very clear that a home-ruled city has the authority to issue ordinances, create ordinances, as long as they're not in direct conflict and the magistrate found very clearly this is not in direct conflict with chapter 393 of the Finance Code or any other provision of Texas law and they've not brought forward to this court as part of their appeal that point that somehow it is in conflict. They're arguing Patel and they're arguing these two Fort Worth cases. But, Your Honor, I would submit that the issue of this was not a huge drastic change that should have caused their business to totally fail, as they protested it was going to do back in June of 2021 when they were pursuing this. And while they were protesting, we're going to have to close businesses. We're scaring away customers and we people aren't are coming in and they're looking at our new product and they're saying I don't want to have to make that big upfront payment and we're losing business. Well, I think part of the problem that Title Max may have had is the way they restructured their business in reaction to the ordinance. That may have a lot to do with it because once the ordinance was adopted and Title Max then was responding to it and reacting to it. In the record below, there is an affidavit from Mr. Jose Cotto. It's in the record. He says, to comply with the amending ordinance, Title Max ceased arranging its now non-compliant four-by-five loan product, which is what I described earlier, in Dallas as of January 28th and began arranging a 30-day single payment title secured loan created in response to Austin's ordinance, which Dallas essentially copied. That's true. Dallas essentially adopted an ordinance that Austin had enacted on January 27, 2021. Title Max now facilitates a 30-day single payment loan. They're able to refinance it up to three times, but essentially what Title Max did, according to their own affidavit below, was they restructured their product to make it a 30-day loan. So if people are coming in and they're being told, okay, if you want to borrow $1,250, here's our loan terms. Let me interrupt you. I'd asked opposing counsel about the usury provision in our state constitution, Article 16, Section 11, which again empowers the legislature to regulate interest rates in the name of preventing usury. There was a case about 80 years ago from the Texas Supreme Court called Berry, the city of Fort Worth, and in that case, the Supreme Court said that that provision gives power that's lodged exclusively in the legislature and it doesn't lie within the power of a city government. So how do you square the fee cap provision of the Dallas ordinance in this case? You're with Article 16, Section 11, and the Berry decision. Here's where I would square it, and frankly, I will tell you some of the cases you've mentioned I have not looked at, I'm not familiar with, but there's a case out of the Fifth Circuit that you may be familiar with more than I am. I think it's Lovett or something like that, where the Fifth Circuit essentially decided that these ancillary charges in this case that I'm referring to, and I haven't looked at it recently, in this case that I'm referring to, there was actually in the lawsuit, the litigant actually made a claim that these ancillary charges that they're making that are 200, 300, 400 percent APR, they actually made the claim that those were usurious and that that was a basis of liability. They went after the this industry that charges these excessive rates, and in that case out of the Fifth Circuit, the Fifth Circuit said, no, these charges are not interest. So that basically insulated this industry from the whole usury issue, and I think that same case, although they weren't addressing the issue Your Honor's raising, I think it made very clear that this industry and what they do and the charges they extract aren't treated as interest. In the district court below, did the city offer any sort of rebuttal evidence that would undercut the Title Max testimonial evidence about the ordinance's effects on unsecured lending? Your Honor, we did not put forward evidence or dispute the issue, and I think they kind of overblowed this. We didn't dispute the issue on the irreparable harm, and I'm sure Your Honor, being a former justice on the Texas Supreme Court, well knows under Texas law, governmental entities have immunity, and it is absolutely clear black and white law that a city like Dallas has and is certainly asserting and will assert in this case that if we're decided to be wrong, the city has immunity. So with immunity, we understood and expected that we weren't going to put up a big fight on irreparable harm. Now, it's not undisputed that the ordinance, the effect of the ordinance, is absolutely going to require them to close. Two points, two points I'd make on that again. One coming back to Mr. Cotto's affidavit, I would suggest that to the extent Title Max was concerned about closing, they may have, to a significant degree, created a lot of their own problem. For example, if someone comes into a Title Max store and they... That's a fact issue, right? Excuse me? That's a fact issue. Well, it's an argument, it's an argument that's based on what's in the record. But it's a fact issue. It is. Are there findings in your favor on that? And which is entitled to a presumption of correctness, Your Honor. Right. If someone had gone into a Title Max store based on Mr. Cotto's affidavit, where he says they had the one payment loan product, I'm going to write you a 30-day loan, $1,250, they'll be due in 30 days. Somebody hears that and they go, I'm not going to be able to come up... What's the finding of fact below on that? Well, there's not an explicit... Tell us and we can move on. Well, it's not an explicit finding, but I think it's fair when you're looking at the statute, when you're looking at... So, to the extent Title Max might have lost business for that person who was so-called scared away, that's a fact issue. We cannot decide that here. Well, but I'm explaining why, because that is a fact issue and that's a plausible reason why the magistrate refused to grant their injunction, that is also a plausible basis for it and one that is all the more reason why the decision below should be affirmed. If that person who went into a Title Max place to seek a loan and was told we'll do a $1,250 30-day loan, they could go down to Ace Cash Express or another one. If they restructured their loan product... Is there evidence in the record on that that other businesses like this are unaffected? Well, the evidence in the record is this, and let me address it, because it comes up in the amicus brief which Title Max joined issue with and and said was correct. So, let me address that. In the amicus brief, and I've got the excerpts right here. In the amicus brief, and again, the next step I'm going to come to is that Title Max said it is correct that. So, I'm going to get to that in a point in just a moment, but I need to make the point first. In the amicus brief, the Texas Appleseed Organization and the other entities that it cooperated with on the amicus brief indicated that looking at from 20 to 2021, the total lending actually increased. After the ordinance was in effect in the Dallas statistical area, according to statistics from the OCCC, the Office of Consumer Credit Commissioner, the lending activity between 2020 and 2021 increased from $138 million in 2020 on this loan product, the CAB loans, $138 million to $144 million, actually increased 2020 to 2021. Pre-ordinance to the first year of the ordinance was in effect. Is that in the record? Well, I'm saying that this is... The amicus brief is not in the trial court record. But Title Max confirmed they agree with that information, and I'm submitting that it shows that the lending activity has remained strong, and it also shows that more, again, Title Max says, yes, the information is correct. We're not going to adjudicate facts here. If it's not in the record, we're not going to. I would submit, Your Honor, that the other thing that I would submit, since we didn't put an affidavit in the record, for example, because we didn't feel like it was either necessary or appropriate on the issue of irreparable harm, government entity has immunity. Okay, we're not going to put up a big fight on reparable harm. It's not exactly correct to say that it was totally undisputed. Their affidavits in the record, which the court below was inclined or had the discretion and authority to give as much or as little weight as the court wanted, their affidavits below were almost chicken little-like in saying the sky's going to fall, we're going to fail, we're going to shut down our business. That was in June of last year. Well, they're still doing business. And in fact, the number of storefronts that do these types of has increased. Now, Title Max may have shut a few. I don't know exactly that. They're in a better position to know that than I am. But the number of stores, the lending hasn't dried up, the loans are still being made. That's not in the trial court record either. Your Honor, I'm quickly running out of time. I would submit, and I don't really have time to address it, but the court, the new Texas Supreme Court opinion the court addressed is something that I think does dovetail with an argument we raised in our brief about in order to have a due process right, you first have to establish that the right is something that is recognized as a constitutional right. And we would submit that based on the new case, that the right to make, to extract these predatory charges is somewhat to me analogous to the activity that was addressed in the Crown Services case, the Crown Distributing case, where the Supreme Court there determined that the right that entity was trying to assert was not something that was constitutionally protected. And therefore, on the basis of the points and arguments stated in our brief and the arguments made today, we respectfully request that the court affirm the lower court's decision denying the injunction. Thank you. May it please the court, first addressing Chief Judge Richman's question to me, as to which I very obviously fumbled. Any state regulation or outlawing of short-term lending would still have to bear a rational relationship to a legitimate state purpose, just as the City Council's action. And if the state's demonstration of that relationship were as non-existent as the city's in this case, then it would certainly contravene Article I, Section 19. Then the next, my statement was actually going to preemption, which is that... Let me interrupt you real quick with time ticking down. So your brief, it cites a sworn declaration in the district court. This is a record question. So there's a sworn declaration filed in the district court by a Title Max executive that the ordinance would really make it impossible to profitably make the kind of unsecured loans that Title Max makes. But is there also any evidence in the record that the ordinance would have a similar effect on title-secured loans? The evidence in the record is that Title Max is continuing to operate for a length of time, losing money. What's happening is that Title Max's operations in other cities are currently subsidizing the operations in Dallas, which are losing money, but continuing in the hope of being able to get relief from this court or the court below. So that's the evidence that we have. It is in the spreadsheet. It is testimony that the company is losing money, and companies don't continue to operate when they're losing money, just as they don't close stores just for the effect of it. They close stores because they're losing money. What's your preemption argument? Preemption argument, Your Honor, is that, again, we focused here on the fact that a Texas home rural city cannot prohibit the operation of a business that is authorized by the state. And our title-secured lending is licensed by the state. Our unsecured lending business is registered with the state and allowed according to that explicitly prohibit short-term lending. It does like the city of Denton did in that Murphy vs. Wright case that we cited. When the city did not prohibit dance halls, it just said you can't operate the dance hall at a location that, when you look at the facts on the ground, doesn't exist anywhere in the city of Denton. It's when you look at the facts in operation that you realize no business can afford to operate in Dallas under these restrictions, including, Your Honor, title secured loans, as you mentioned. So there's the preemption argument that goes with it. There's no, all right, I want to make sure, you didn't cite any statute or regulation that says fees can only be this much or they can be up to, it's not that kind of direct conflict that you're For purposes of this appeal, Your Honor, it is not. We did cite to the district court the fact that the section 393 says we can charge such fees as are agreed to. For the purposes of this appeal, that's not part of what we're going for. You're correct on that, Your Honor. As for restructuring, what Title Max did was restructure to a single payment loan that can be renewed up to three times and comply with the statute. The loan was restructured to make it comply with the statute. Customers are told they can renew it up to three times. They're not told the entire nut has to be paid within 30 days. Final question, from me at least. So there is this Texas constitutional principle of economic freedom. Yes. But even Patel, Patel recognized that a law doesn't violate the due course of law provision if it has a quote real or substantial relationship to public health, morals, or safety. So I want to hone in on that word morals because the legal prohibition of traditions. And so yes, there's an underlying bedrock principle of economic freedom, but Patel says that laws can still pass muster if they have a substantial relationship to protecting morals. Prohibitions on usury are kind of rooted in kind of this moral tradition. So talk about that. Two things come into play with that, Your Honor. First of all, our declarations establish that our customers who don't have the credit rating that Bank of America's and Comerica's customers have, our loans are either the only source of available credit or at least the least disadvantageous source of credit. And we cited a famous study by economists at the New York Fed that showed that when you ban so-called payday lending, customers in our customer base are forced to go to less advantageous, more injurious forms of credit like bouncy checks. And there was an objective study that under the circumstances and the evidence available to economists at the Fed showed that bounce checks went up, bounce checks charges went up, banks began collecting millions more dollars in bounce check fees because that's where people can turn. There's also, but our testimony is that our loans for our customers are basically the best there are for that. So that's the reason, Your Honor, that it is not moral to take away the source of emergency credit from someone who needs $1,500 to repair the truck that he takes to work and can't get it anywhere else. That's my argument there. In closing, partly personal, I first entered this courthouse many years ago as a law clerk to the Honorable Tom G. I have been back since then many times to argue, and during those four plus decades, neither this courthouse nor this court has lost the aura that I felt when I first walked through these doors. I know that my presentation today have met the expectations of this Honorable Court. Thank you. Thank you, Kim.